UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

RICHARD BRIAN BRUESTLE,

       Petitioner,

v.

JESSICA SYMMES, Warden,

       Respondent.

Civil No. 07-2251 (DSD/AJB)

**REPORT AND RECOMMENDATION**

---

      Attorney Kyle D. White, 332 Minnesota Street, Suite W-1710, St. Paul, Minnesota, 55101, for Petitioner.

      Attorney Mark Nathan Lystig, Assistant Ramsey County Attorney, 50 West Kellogg Boulevard, Suite 315, St. Paul, Minnesota, 55102, for Respondent.

---

ARTHUR J. BOYLAN, United States Magistrate Judge

      This matter is before the undersigned Magistrate Judge of the District Court on the petition of Richard Brian Bruestle for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The matter has been fully briefed by the parties, and referred to this Court for report and recommendation under 28 U.S.C. § 636 and Local Rule 72.1. For the reasons discussed below, the Court concludes that Petitioner's habeas corpus petition should be DENIED, and this action should be DISMISSED WITH PREJUDICE.

## I. BACKGROUND

      The record in this case shows that Petitioner has a long woeful history of cognitive deficiencies, mental illness, and substance abuse. When he was fourteen years old, he was convicted and sentenced, as an adult, for rape, and it appears that he spent much of the next twenty-five years in various penal institutions.

In July 2002, Petitioner was released from a Colorado prison that housed mentally ill inmates.  Shortly thereafter, Petitioner moved into his aunt's home in St. Paul, Minnesota. He had frequent arguments with his aunt, and on December 7, 2002, he murdered her. Petitioner was apprehended by police at the scene of the crime, and he readily admitted that he had killed his aunt.   In Petitioner's current habeas corpus petition, he still acknowledges that "after a day of intoxication and acrimony, [he] attacked and killed his aunt... eventually inflicting thirty-nine stab wounds and shooting her five times."  (Petition, [Docket No. 1], p. 6.)

After Petitioner was arrested, he was charged with second degree murder, and placed in the Ramsey County Jail.  Soon after Petitioner went to jail, he sent two notes to jail attendants seeking help for his "unstable mental condition."   In one of those notes, Petitioner indicated that he had been "off psychiatrist ordered meds for 2 mo[nths]," and that his "behavior [was] becoming more bizarre and unpredictable."  In the other note, he indicated that he believed his "violent offense" was "connected" to his "recent discontinued use of psychiatrist ordered medications."[1]   Petitioner was then evaluated by Ramsey County health care providers, and one of them, Dr. Dupre, prescribed two medications for Petitioner's mental health problems – Trilafon and Artane.[2]

---

[1]  Copies of these two notes are included in the present record as attachments to "Petitioner/Appellant's Brief and Appendix" in the Minnesota Supreme Court, which has been submitted as part of Respondent's Answer, (Docket No. 7).

[2]  A copy of the relevant portion of Petitioner's Ramsey County medical records is included in the present record as an attachment to "Petitioner/Appellant's Brief and Appendix" in the Minnesota Supreme Court, which has been submitted as part of Respondent's Answer, (Docket No. 7).

Trilafon is used the treat schizophrenia.  <u>PDR Drug Guide for Mental Health</u>

At one of the initial hearings in Petitioner's state criminal case, his court-appointed public defender requested that Petitioner be examined by a mental health expert, pursuant to Rules 20.01 and 20.02 of the Minnesota Rules of Criminal Procedure, to determine (a) whether Petitioner was competent to stand trial, and (b) whether Petitioner suffered from a mental disease or defect at the time of the charged offense, which prevented him from understanding the wrongfulness of his actions.   That request was granted,[3] and a psychologist named Owen Nelson was retained to conduct a mental examination of Petitioner.

When Petitioner's attorney asked the Public Defenders Office for permission to pay Dr. Nelson $2000.00 to examine Petitioner, he received the following e-mail response:

> "We will be having problems with our expert budget soon.  This is the type of case that needs experts but we need your cooperation to keep expenses down.  If Owen Nelson tells you (and you need to ask) at an early point that he cannot help you, cancel the remainder of his work.  We do not need another report which echoes the courts."[4]

Dr. Nelson examined Petitioner sometime during December 2002, but he did not prepare a written report of the results of that examination.   On December 30, 2002, Petitioner's attorney wrote a letter to the prosecuting attorney, which indicated that

---

Professionals, Second Edition, (2004), p. 220.   Artane is used to control side effects caused by antipsychotic drugs.  Id., p. 488.

[3]   A copy of the trial court's order approving Petitioner's request for a mental health examination is included in the present record as an attachment to "Petitioner/Appellant's Brief and Appendix" in the Minnesota Supreme Court, which has been submitted as part of Respondent's Answer, (Docket No. 7).

[4]   A print-out of this e-mail message is included in the present record as an attachment to "Petitioner/Appellant's Brief and Appendix" in the Minnesota Supreme Court, which has been submitted as part of Respondent's Answer, (Docket No. 7).

Petitioner was prepared to plead guilty to the pending second degree murder charge. The letter further stated that:

> "[Petitioner] was referred for an evaluation under Minn.R.Cr.P. 20.01 and 20.02. I am confident that he is competent at this time. The time he has spent in the ADC [i.e., the Ramsey County Adult Detention Center] under the care of a nurse seems to have helped him stabilize. [Petitioner] would be willing to waive any further examination under Rule 20.02."[5]

One month later, (January 30, 2003), the trial court held another hearing in Petitioner's criminal case, at which time Petitioner's attorney told the court that:

> "In the subsequent six or seven weeks [after the court's previous order approving a mental examination] nothing has happened, and [Petitioner] has since stabilized while he's been in the Ramsey County Adult Detention Center. I think he's seeing a psychologist there and getting some medications. So at this time I don't – I don't see any need to have a Rule 20.01 and 20.02 evaluation, and make a motion to withdraw those requests here this afternoon."

(Petition, p. 15.[6])

In February 2003, a grand jury was convened, and Petitioner was indicted on two counts of first degree murder. The prescribed sentence for one count was life in prison <u>with</u>

---

[5] A copy of the letter written by Petitioner's attorney is included in the present record as an attachment to "Petitioner/Appellant's Brief and Appendix" in the Minnesota Supreme Court, which has been submitted as part of Respondent's Answer, (Docket No. 7).

[6] The statement attributed to Petitioner's attorney purportedly appears in a transcript of the hearing held on January 30, 2003. Although that transcript does not appear to be included in the present record, Respondent has not disputed the accuracy of the statement attributed to Petitioner's attorney, and the Minnesota Supreme Court's subsequent decision in Petitioner's case refers to the same statement. <u>See</u> <u>Bruestle v. State</u>, 719 N.W.2d 698, 701 (Minn. 2006) ("On January 30, 2003, the public defender withdrew the motion for a Rule 20 evaluation, stating that 'Mr. Bruestle has since stabilized * * *. I think he's seeing a psychologist [at Ramsey County Adult Detention Center] and getting some medications. So at this time I don't * * * see any need to have a Rule 20.01 and 20.02 evaluation * * *"). Therefore, the Court accepts Petitioner's representations regarding the statement made by his attorney at the hearing on January 30, 2003.

the possibility of parole, and the prescribed sentence for the other count was life in prison without the possibility of parole.

On March 5, 2003, (only a week or so after the grand jury's indictment), Petitioner appeared before the trial court on the new first degree murder charges. At that hearing, Petitioner's attorney indicated that Petitioner would waive his right to a trial, and plead guilty to the new first degree murder charge that allowed for the possibility of parole. The prosecutor agreed to dismiss the other first degree murder charge, as well as the earlier second degree murder charge. (The transcript of the hearing on March 5, 2003, [hereafter "Tr."], is included in the present record as part of Respondent's Answer. [Docket No. 7.])

During the ensuing plea colloquy, Petitioner was questioned extensively, to ensure that his guilty plea was being entered knowingly and voluntarily. (Tr. pp. 7-12.) Petitioner's answers show that he understood that by pleading guilty, he would be given a life sentence, and he would not be eligible for parole for at least 30 years. (Id. p. 7.) Petitioner also acknowledged that he was waiving many important rights, including (i) the right to have the trial judge determine the admissibility of the prosecution's evidence against him; (ii) the right to a jury trial; (iii) the right to be presumed innocent, which could be overcome only if the prosecution proved him guilty beyond a reasonable doubt; (iv) the right to cross-examine prosecution witnesses; (v) the right to call his own witnesses; and (vi) the right to decide for himself whether to testify, or not testify, at his trial. (Id. pp. 7-9.)

Petitioner also expressly acknowledged that by pleading guilty, he would be giving up the right to raise certain potentially viable defenses. His attorney specifically pointed out that he would be waiving a potential "intoxication defense," and a possible "mental illness defense." (Id. p. 9.)

5

Finally, Petitioner was reminded of his history of mental illness, and he was asked about his current mental condition.  Petitioner said that he was taking medications for his mental health problems, and that they were "actually helping." (Id.) He was asked whether he was "clear-headed," and responded "yeah." (Id.) He was asked whether he understood "what's going on here today," and said "yes."  (Id.)  Lastly, Petitioner's counsel asked:  "Is this really what you want to do to take care of your case here today?"  (Id.)  He answered: "I deserve it."  (Id.)

After Petitioner's counsel finished his questions, the trial court judge asked Petitioner several more questions.  That part of the colloquy included the following questions and answers:

> "THE COURT: I see.  And, so, you're now on your proper medications and you feel pretty good?
>
> THE DEFENDANT: Yeah, I'm able to function reasonably well, yeah.
>
> THE COURT: All right.  Have you had enough time to talk with your lawyer?  He said he talked with you yesterday, but I assume you talked to him before yesterday?
>
> THE DEFENDANT: Sure, sure, a lot times, yeah.
>
> THE COURT: So, you've been meeting with him and talking with him about this case for how long?
>
> THE DEFENDANT: Right.  Oh, almost three months.
>
> THE COURT: I see, okay.  Has – do you think that he's given you good counsel and been supportive and helpful and has done a good job in this case?
>
> THE DEFENDANT: I think he has."

(Id. pp. 10-11.)

After listening to Petitioner's responses to the questions presented to him during the plea hearing, the trial court concluded that Petitioner had "intelligently and voluntarily and knowingly waived" all of his constitutional rights.  (Id. p. 12.)  The prosecutor then asked Petitioner a series of questions about the murder itself, and based on Petitioner's answers to those questions, the trial court found that there was a "sufficient factual basis" for Petitioner's guilty plea.  (Id. p. 19.)

At the conclusion of the hearing, Petitioner's attorney advised the Court that Petitioner had been "very adamant about taking responsibility for his actions, despite my prodding to suggest that there is nothing to lose by going to trial."  (Id. p. 20, [emphasis added].)  Petitioner then personally apologized for killing his aunt, and acknowledged the "pain and suffering" he had caused.  (Id. p. 21.)  After that allocution, Petitioner was sentenced to life in prison, with the possibility of parole after 30 years.  (Id. pp. 21-22.)  The judge asked Petitioner if he understood that he would not be eligible for parole for at least 30 years, and Petitioner responded, "I know, yes."  (Id. p. 22.)

Petitioner did not file a timely motion to withdraw his guilty plea, nor did he file a direct appeal.  However, in January 2004, almost a year after Petitioner pled guilty and was sentenced, he filed a post-conviction motion in the trial court.  Petitioner was represented by a new attorney in his post-conviction proceedings, and he filed a memorandum and several exhibits in support of his motion.  The post-conviction motion raised two arguments. First, Petitioner argued that he had received ineffective assistance of counsel during the original trial court proceedings, because his attorney did not adequately explore Petitioner's mental disabilities.  He also argued that his guilty plea had not been entered knowingly and voluntarily.

7

Petitioner attempted to support both of his post-conviction arguments by citing a psychological evaluation from October 2002, (approximately six weeks before Petitioner murdered his aunt), which was prepared in connection with Petitioner's then-pending application for social security benefits.   The psychologist who examined Petitioner, Dr. Robert C. Barron, found that he had a "Full Scale I.Q. of 69," and had a history of mental illnesses.  Dr. Barron concluded that "it would appear that he is capable of communicating, comprehending, and retaining simple directions at an unskilled, competitive employment level," but "it would appear doubtful that he would be capable of withstanding work stresses and relating to supervisors, co-workers, and the public required for an unskilled, competitive employment level."[7]   On March, 20, 2003 – approximately two weeks after the guilty plea – Petitioner was notified that his application for social security benefits had been approved. (Petition, p. 18.)

While Petitioner's post-conviction motion was still pending before the Ramsey County trial court judge, Petitioner was charged with another crime for assaulting a fellow prison inmate.   In that case, which was prosecuted in Sherburne County, Minnesota, Petitioner again sought a mental examination pursuant to Rule 20.01 and 20.02 of the Minnesota Rules of Criminal Procedure.  He was examined by a forensic psychologist, Dr. Gregory A. Hanson, and a forensic psychiatrist, Dr. Maureen Hackett.  Both doctors found Petitioner to be mentally ill, but Dr. Hanson did "not see any indication that the instant offense [i.e., the prison assault]... occurred as a consequence of symptoms of a psychotic

---

[7]   A copy of Dr. Barron's report, (hereafter "Barron Report"), is included in the present record as an attachment to "Petitioner/Appellant's Brief and Appendix" in the Minnesota Supreme Court, which has been submitted as part of Respondent's Answer, (Docket No. 7).

mental disorder," while Dr. Hackett concluded that in light of Petitioner's "totality of mental impairments including his severe paranoid thinking and his mental deficiency that he did not know the wrongfulness of his actions during the assault."[8]   The Sherburne County assault case ultimately was decided based on a set of stipulated facts, and on September 20, 2005, the trial court found Petitioner guilty of second degree assault with a dangerous weapon.[9]

Petitioner's Ramsey County post-conviction motion was continued until after the mental examinations were completed for the Sherburne County assault case.  The reports resulting from the mental examinations in that case were then submitted to the Ramsey County judge, to further support Petitioner's pending post-conviction claims.

On June 29, 2005, the Ramsey County post-conviction motion was denied on the merits, without an evidentiary hearing.[10]   Petitioner then appealed to the Minnesota

---

[8]   A copy of Dr. Hanson's report, (hereafter "Hanson Report"), is included in the present record as an attachment to "Respondent's Brief and Appendix" in the Minnesota Supreme Court, which has been submitted as part of Respondent's Answer, (Docket No. 7).  (The quote in the text is from page 20 of the Hanson Report.)  A copy of Dr. Hackett's report, (hereafter "Hackett Report"), is included in the present record as an attachment to "Petitioner/Appellant's Brief and Appendix" in the Minnesota Supreme Court, which has been submitted as part of Respondent's Answer, (Docket No. 7).  (The quote in the text is from page 12 of the Hackett Report.)

[9]   A copy of trial court's "Findings of Fact, Conclusions of Law and Judgment" is included in the present record as an attachment to "Respondent's Brief and Appendix" in the Minnesota Supreme Court, which has been submitted as part of Respondent's Answer, (Docket No. 7).

[10]   A copy of trial court judge's eight-page order denying the post-conviction motion is included in the present record as an attachment to "Petitioner/Appellant's Brief and Appendix" in the Minnesota Supreme Court, which has been submitted as part of Respondent's Answer, (Docket No. 7).

Supreme Court.[11]

Petitioner's post-conviction appeal raised the same claims that had been presented in the trial court, i.e., (i) that his guilty plea had not been entered knowingly and voluntarily, because he was not mentally competent to enter a valid and enforceable plea, and (ii) that he had received ineffective assistance of counsel, because his trial attorney did not adequately explore various defenses that could have been raised, and he did not discuss those potential defenses with Petitioner. He also contended that the trial court should have conducted an evidentiary hearing in connection with the post-conviction motion.

The Minnesota Supreme Court affirmed the trial court's ruling on Petitioner's post-conviction motion. Bruestle v. State, 719 N.W.2d 698 (Minn. 2006). The Court concluded that Petitioner had "produced no evidence that he was incompetent at the time of his plea," (id. at 706), and he had "presented no evidence" to satisfy his "burden to prove that his counsel was ineffective," (id. at 705).

After Petitioner's post-conviction appeal was complete, he filed his current petition for federal habeas corpus relief. Petitioner again claims that (i) his guilty plea was invalid, because he lacked the mental competency to enter a binding plea; and (ii) he was deprived of his constitutional right to effective assistance of counsel, because his attorney (a) did not challenge his competency to plead guilty, and (b) did not adequately investigate and advance an insanity defense. This Court now finds that Petitioner cannot be granted a writ

---

[11]   In post-conviction proceedings involving a conviction for first degree murder, appeals are taken directly to the Minnesota Supreme Court. Minn. Stat. 590.06.

of habeas corpus on either of his two claims for relief.[12]

## II. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996, ("AEDPA"), prescribes

the standards that govern this Court's substantive review of a state prisoner's habeas

---

[12] Respondent has suggested that Petitioner might be attempting to raise a third claim for relief based on Brady v. Maryland, 373 U.S. 83 (1963), which obligates prosecutors to provide exculpatory evidence to defendants.  (See Answer to Habeas Corpus Petition, [Docket No. 8], pp. 4-5; Petition, [Docket No. 1], pp. 5, 8-9.)  Petitioner has referred to certain undisclosed video and audio tapes that purportedly were recorded by the police shortly after his arrest, as well as certain undisclosed medical reports that purportedly were obtained pursuant to a search warrant. (Petition, pp. 8-9.)  However, it appears doubtful that Petitioner actually intended to raise an independent Brady claim based on this allegedly undisclosed evidence.  No such claim is clearly identified as an independent ground for relief in the petition, nor is any such claim mentioned in Petitioner's supporting memorandum.  In fact, the supporting memorandum specifically states that Petitioner is raising only "two related grounds" – (1) ineffective assistance of counsel, and (2) that his plea was "unknowing and unintelligent." ("Memorandum In Support Of Petition [etc]," [Docket No. 2], p. 24, [emphasis added].)  Thus, it clearly appears that Petitioner cited the allegedly undisclosed evidence only to support his contention that his trial attorney did not adequately investigate and advance all potential defenses.

In any event, if Petitioner did intend to assert an independent Brady claim in his current habeas petition, that claim is procedurally defaulted, (as Respondent has correctly argued), because Petitioner never raised a Brady claim in the state courts, and it is now too late to do so.  "Claims that have not been presented to the state courts, and for which there are no remaining state remedies, are procedurally defaulted."  Skillicorn v. Luebbers, 475 F.3d 965, 976-77 (8th Cir.), cert. denied, 128 S.Ct. 297 (2007).  See also Lyons v. Luebbers, 403 F.3d 585, 593 (8th Cir. 2005)  ("[a] section 2254 applicant's failure to raise a claim in state post-conviction proceedings results in procedural default of that claim"); Barrett v. Acevedo, 169 F.3d 1155, 1161 (8th Cir.) ("[w]e will not review a procedurally defaulted habeas claim because the state has been deprived of an opportunity to address the claim in the first instance"), cert. denied, 528 U.S. 846 (1999).  "Unless a habeas petitioner shows cause and prejudice or that he is actually innocent of the charges, a [federal habeas] court may not reach the merits of procedurally defaulted claims." Skillicorn, 475 F.3d at 976-77.  Petitioner could not overcome a procedural default by showing cause and prejudice, because he has candidly acknowledged that the "evidence" in question, (i.e., the police recordings and the seized medical records), was "easily accessible." (Petition, p. 9.)  Because the evidence at issue was readily discoverable, (as Petitioner freely admits), Petitioner should have been able to raise a Brady claim, (if he believed he had one), in his state post-conviction proceedings.

corpus claims.  The relevant portion of AEDPA, 28 U.S.C. § 2254(d), provides that:

> "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

In <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), the United States Supreme Court discussed the meaning of this statute, and how it should be applied by the federal district courts.  The Supreme Court recognized that

> "a state-court decision can be 'contrary to' this Court's clearly established precedent in two ways.  First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law.  Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours."

<u>Id</u>. at 405.

> "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."

<u>Id</u>. at 413.

The Court also explained that

> "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was <u>objectively unreasonable</u>.... [¶] [A] federal habeas court may not issue the writ simply because that court concludes in its independent

judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."

Id. at 409, 411 (emphasis added).

A writ of habeas corpus may also be available where the state courts' resolution of a prisoner's constitutional claims is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2). In other words, habeas relief can be granted if the state court's resolution of a constitutional claim is based on factual determinations that could not reasonably be derived from the state court evidentiary record.  When reviewing a state court decision, however, "a federal court... presumes that the state court's factual determinations are correct," and that presumption "may be rebutted only by clear and convincing evidence."  Lee v. Gammon, 222 F.3d 441, 442 (8th Cir. 2000).

Needless to say, a federal district court is not allowed to conduct its own de novo review of a prisoner's constitutional claims.  Habeas relief cannot be granted unless the prisoner has identified, and substantiated, a specific error committed by the state courts that caused him to be deprived of his federal constitutional rights.  Moreover, he must show that the state courts committed the type of error that is actionable under § 2254(d), as that statute has been interpreted by the Supreme Court in Williams.

## III. DISCUSSION

### A.  Ground One: Validity of Petitioner's Guilty Plea

Petitioner contends that his guilty plea was not binding and enforceable, and should have been vacated on his state post-conviction motion, because his plea was not entered knowingly and intelligently, due to his mental condition at the time.  In short, he contends

13

that he lacked the mental competence to enter a valid plea.

"A criminal defendant may not... plead guilty unless he does so 'competently and intelligently.'" Godinez v. Moran, 509 U.S. 389, 396 (1993).  See also Hunter v. Bowersox, 172 F.3d 1016, 1020 (8th Cir. 1999) ("Due process requires that a defendant be competent to plead guilty"), cert. denied, 528 U.S. 1140 (2000).[13]   The standard for determining whether a defendant is competent to plead guilty is the same as the standard for determining whether a defendant is competent to stand trial.  Godinez, 509 U.S. at 397-98. "[T]he standard for competence to stand trial" – and thus the standard for competence to enter a guilty plea – "is whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'"  Id. at 396, quoting Dusky v. United States, 362 U.S. 402, (1960) (per curiam).  See also Drope v. Missouri, 420 U.S. 162, 171 (1975) (same).

"[A] State may presume that the defendant is competent and require him to shoulder the burden of proving his incompetence by a preponderance of the evidence."  Cooper v. Oklahoma, 517 U.S. 348, 355, (1996), citing Medina v. California, 505 U.S. 437, 449

---

[13]  In Godinez, the Supreme Court identified a distinction between entering a plea "competently," and entering a plea "knowingly and voluntarily."  The Court pointed out that "[t]he focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the ability to understand the proceedings" while "[t]he purpose of the 'knowing and voluntary' inquiry, by contrast, is to determine whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced." 509 U.S. 389, 401 n. 2, (emphasis in the original).  Here, some of Petitioner's arguments seem to conflate the "competency" requirement and the "knowing and voluntary" requirement.  However, looking at Petitioner's arguments as a whole, it clearly appears that he is claiming that he lacked the mental capacity and ability to understand what he was doing when he pled guilty – i.e., that he was not competent to enter a valid plea.

(1992).  See also Lyons v. Luebbers, 403 F.3d 585, 593 (8th Cir. 2005) ("'[t]he due process clause permits a state to require a defendant to bear the burden of proving his or her own incompetence'") (quoting Rhode v. Olk-Long, 84 F.3d 284, 288 (8th Cir.), cert. denied, 519 U.S. 892 (1996)); Forsyth v. Ault, 537 F.3d 887, 891 (8th Cir. 2008) (noting and accepting that under Iowa law, "[a] defendant is presumed competent and bears the burden of proving otherwise"), cert. denied, 129 S.Ct. 1044 (2009).  Minnesota has adopted such a presumption, and thus a Minnesota "criminal defendant who has... pleaded guilty bears the burden of proving that his plea was invalid."  Morris v. State, No. Nos. A05-1425, A06-542, A05-2518, A06-433 (Minn.App. 2006), 2006 WL 3361928 (unpublished opinion), rev. denied, Jan. 24, 2007.

        In Petitioner's case, the Minnesota Supreme Court correctly recognized that "no one may be tried for or plead guilty to a crime if he is incompetent to stand trial due to mental illness or mental deficiency."  Bruestle, 719 N.W.2d at 704, citing Minn.Stat. § 611.026 (2004).  The Court further recognized that "a defendant is incompetent to stand trial if he: '(1) lacks sufficient ability to consult with a reasonable degree of rational understanding with defense counsel; or (2) is mentally ill or mentally deficient so as to be incapable of understanding the proceedings or participating in the defense.'" Id., quoting Minn. R. Crim. P. 20.01.  The recitation of these principles shows that the Minnesota Supreme Court decided Petitioner's incompetency claim in accordance with the applicable federal constitutional standards and requirements.  Therefore, it cannot be said, with regard to Petitioner's incompetency claim, that the decision of the Minnesota Supreme Court is "contrary to" apposite precedent established by the United States Supreme Court.

The trial court, and the Minnesota Supreme Court, determined that Petitioner had not met his burden of proving that he was incompetent to enter a valid guilty plea. Bruestle, 719 N.W.2d at 706 (Petitioner "has produced no evidence that he was incompetent at the time of his plea"). This was a factual determination that is presumed to be correct on federal habeas review. Demosthenes v. Baal, 495 U.S. 731, 735 (1990) (per curiam); Lyons, 403 F.3d at 593. This Court now finds that Petitioner has not effectively refuted the state courts' presumptively correct determination that he was competent to plead guilty.

Petitioner's challenge to the state courts' competency determination rests primarily on the reports of three mental health experts – (1) Dr. Barron, who examined Petitioner in October 2002, in connection with Petitioner's application for social security benefits, (2) Dr. Hanson, who examined Petitioner in July and August 2004, pursuant to a court order in Petitioner's Sherburne County assault case, and (3) Dr. Hackett, who examined Petitioner in June 2004, in connection with the Sherburne County case.

Dr. Barron's report does not support Petitioner's claim that he was incompetent to plead guilty. Dr. Barron examined Petitioner in October 2002, which was more than four months before Petitioner entered his plea, and – more significantly – at a time when Petitioner was "not receiving mental health services," and apparently not taking any medications. (Barron Report, p. 3.) The record in this case shows that Petitioner began to receive prescription medications (again), under the supervision of Ramsey County medical officials, after he was taken into custody for the murder of his aunt. The record also shows that by the time Petitioner entered his guilty plea, he was satisfied that his mental health status had improved. (Tr. 10.) Thus, Dr. Barron's report provides no meaningful insight into Petitioner's mental health status as of the date when he entered his

16

guilty plea.

Furthermore, Dr. Barron's Report does not show that Petitioner was legally incompetent <u>even at the time of the examination in October 2002</u>.  The report says that "it would appear doubtful that he would be capable of withstanding work stresses and relating to supervisors, co-workers, and the public," but it also says that "he is capable of communicating, comprehending, and retaining simple directions."  (Barron Report, p. 4.) Thus, Dr. Barron's Report strongly suggests that even though Petitioner may have been disabled for social security purposes, he was capable of communicating with his attorney, and comprehending what was happening during his plea proceedings.

Dr. Hackett's Report obviously provides the strongest support for Petitioner's incompetency claim.  She opined that Petitioner "suffers from a congenitally based cognitive deficit that is even more debilitating due to what is likely brain damage from inhalant abuse and the deteriorating effects of chronic psychosis that all make his mental state severely and persistently impaired."  (Hackett Report, p. 11.)  She further opined that Petitioner "did not know the wrongfulness of his actions during the assault" for which he was prosecuted in Sherburne County.  (<u>Id</u>., p. 12.)  However, Dr. Hackett apparently did <u>not</u> express any specific opinion about whether Petitioner was competent to stand trial, (or enter a plea), in the Sherburne County assault case.  More importantly, she certainly did not express any opinion about whether Petitioner was legally competent when he pled guilty to the crime at issue here.

Dr. Hanson, on the other hand, did express a specific opinion about Petitioner's competency to stand trial – at least in the Sherburne County assault case.  He concluded, unequivocally, that Petitioner was "competent to proceed to trial on the charge against

him." (Hanson Report, p. 17.)  Moreover, the trial court judge in the Sherburne County case must have accepted Dr. Hanson's competency determination, because Petitioner ultimately did go to trial, and was convicted.

In sum, the reports of Drs. Barron, Hackett and Hanson show that Petitioner suffers from serious mental illnesses and cognitive deficits, but they do <u>not</u> show that he was incompetent to enter a valid plea in March 2003.

The only other part of the evidentiary record that is relevant to Petitioner's incompetency claim, (aside from the reports of Drs. Barron, Hackett and Hanson), is the transcript of the plea colloquy.   That transcript further undermines Petitioner's incompetency claim.  Petitioner's responses to the questions posed to him during his plea hearing show, quite compellingly, that he understood what was happening.  Although Petitioner expressed some confusion about the spelling of his middle name, (Tr. p. 6), he otherwise answered <u>all</u> of the questions that were put to him in a direct, cogent, and appropriate manner.  The transcript shows that he was fully engaged, and fully aware of what was happening.  The transcript also shows that Petitioner had a clear recollection of the crime for which he was convicted.  (Tr. 13-19.)  The Court finds nothing in the transcript which suggests that Petitioner had any difficulty understanding what he was doing when he pled guilty.

Petitioner argues that he must not have been competent to plead guilty, because he purportedly told Dr. Hanson that he had been convicted of second degree murder, rather than first degree murder.   While this argument may afford some nominal support for Petitioner's incompetency claim, it is a very weak argument at best.  First, it is not altogether clear that Petitioner actually did tell Dr. Hanson that he had been convicted of

second degree murder.  Dr. Hanson erroneously reported that Petitioner "entered a guilty plea [to] the charge of second-degree murder," (Hanson Report, p. 10), but it is not clear that Dr. Hanson received that misinformation from Petitioner himself.  Furthermore, even if Petitioner did erroneously tell Dr. Hanson that he pled guilty to second degree murder, that misstatement alone, made more than a year after the plea hearing, would not demonstrate that he must have been incompetent when he pled guilty.[14]

Thus, looking at the record as a whole, the Court finds that Petitioner is unable to surmount the presumed correctness of the state courts' determination that he was competent to enter his guilty plea.  See Weisberg v. State of Minnesota, 29 F.3d 1271, 1278 (8th Cir. 1994) ("[r]etrospective determinations of whether a defendant is competent to stand trial or to plead guilty are strongly disfavored"), cert. denied, 513 U.S. 1126 (1995). The Court therefore concludes that Petitioner is not entitled to a writ of habeas corpus on his first ground for relief.

B.  Ground Two: Ineffective Assistance of Counsel

Petitioner further contends that he was deprived of his constitutional right to effective assistance of counsel, because his attorney did not adequately investigate and assert two defenses – (1) that Petitioner was unable to comprehend the wrongfulness of his action when he killed his aunt, because he was suffering from a serious mental disease or defect, at the time, and (2) that Petitioner lacked the mental competency to enter a valid plea.

In order to succeed on a claim of ineffective assistance of counsel, a habeas

---

[14]  During the plea colloquy, Petitioner expressly pled "guilty" to a charge of "murder in the first degree," and he expressly acknowledged that he would be sentenced to life in prison.  (Tr. pp. 5, 7.)

petitioner must establish (1) that his attorney's performance "fell below an objective standard of reasonableness," and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984); Garrett v. United States, 78 F.3d 1296, 1301 (8th Cir.), cert. denied, 519 U.S. 956 (1996). When evaluating the adequacy of an attorney's representation, this Court must be mindful of the "strong presumption that counsel's conduct falls within the wide range of reasonable, professional assistance." Strickland, 466 U.S. at 689. "Counsel's challenged conduct is to be evaluated in light of the circumstances surrounding the decision, not with the 20/20 vision of hindsight." Garrett, 78 F.3d at 1301.

In order to satisfy the second Strickland requirement, a habeas petitioner must make "a showing of prejudice sufficient to undermine confidence in the outcome of the trial." Id. at 1302. More specifically, the petitioner must demonstrate that there is a "reasonable probability that the proceeding would have ended in a different result without counsel's errors." Auman v. United States, 67 F.3d 157, 162 (8th Cir. 1995). See also Strickland, (defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").

"[T]he two-part Strickland v. Washington test applies to challenges to guilty pleas based on ineffective assistance of counsel." Hill v. Lockhart, 474 U.S. 52, 58 (1985). "In the context of guilty pleas, the first half of the Strickland v. Washington test is nothing more than a restatement of the standard of attorney competence." Id. "[I]n order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going

to trial." Id. at 59.

In Petitioner's case, the Minnesota Supreme Court correctly identified the two-part Strickland analysis, and adjudicated Petitioner's ineffective assistance of counsel claims in accordance with the applicable precedents of the United States Supreme Court.  See Bruestle, 719 N.W.2d at 704-05 ("in order for the postconviction court to conclude that Bruestle's trial counsel was ineffective, the court would have to determine (1) that counsel's decision not to pursue a mental illness or incompetency defense was unreasonable, and (2) that there was a reasonable probability that Bruestle would not have pleaded guilty had his counsel pursued the defense").  Because the state court applied the proper legal standard, (i.e., the Strickland test), the only issue to be resolved here is whether the state court's application of that standard to Petitioner's claims was objectively unreasonable. Nelson v. Hvass, 392 F.3d 320, 323 (8th Cir. 2004).  It bears repeating that "[o]ur review of an ineffective-assistance-of-counsel claim is 'highly deferential.'" Id., citing Strickland, 466 U.S. at 689.

Petitioner contends that there was ample reason to suspect that he was suffering from a mental disease or defect at the time of the crime, and at the time of the plea proceedings.  He further contends that his attorney did not adequately investigate his mental condition, and he therefore failed to recognize and raise two potential defenses: (1) that Petitioner was incapable of comprehending the wrongfulness of his actions, (i.e., an insanity defense), and (2) that Petitioner was not competent to go to trial or enter a valid plea, (i.e., an incompetency defense).

The record shows, however, that Petitioner's trial counsel did recognize that

Petitioner might be able to present an insanity defense and/or an incompetency defense. Counsel therefore requested, and was granted, a court order directing that Petitioner be examined by a mental health professional, for the purpose of determining (a) Petitioner's "capacity to understand the proceedings and to participate in the defense," (i.e., his competency), and (b) "whether, because of mental illness or deficiency, [Petitioner] at the time of the commission of the offense charged was laboring under such a defect of reason as not to know the nature of the act constituting the offense... or that it was wrong." (See n. 3, supra.) The examination was performed by Dr. Nelson.

Petitioner's attorney was told by the Public Defenders Office that if Dr. Nelson could not provide a report that would be helpful to Petitioner's defense, then he (Dr. Nelson) should be instructed to "cancel the remainder of his work." (See p. 3, n. 4, supra.) It appears that, in fact, Dr. Nelson never rendered any written report describing his examination of Petitioner, and his conclusions about Petitioner's mental status.

The only reasonable inference that can be drawn from this scenario is that Dr. Nelson must have indicated that he could not offer any support for an incompetency defense or an insanity defense, and that Petitioner's attorney must have therefore told Dr. Nelson, (pursuant to instructions from the Public Defenders Office), not to submit a written report. Petitioner could have undermined this inference by asking Dr. Nelson to prepare a belated report to support his post-conviction motion. If such a report had been prepared, and if that report showed that Dr. Nelson had found Petitioner to be incompetent or insane, then Petitioner's current habeas claims obviously would be much more potent. In fact, however, Petitioner apparently refused to allow Dr. Nelson to disclose his findings about Petitioner's mental condition. Thus, as explained by the Minnesota Supreme Court:

22

"[Petitioner] has withheld the most probative evidence in the case. His refusal to waive medical or attorney-client privileges has rendered unavailable information from Nelson and [Petitioner's] trial counsel as to what Nelson's conclusions were regarding [Petitioner's] mental state at the time of [the victim's] death and why [Petitioner's] trial counsel decided not to further pursue a Rule 20 [incompetency or insanity] defense.

Bruestle, 719 N.W.2d at 705 (emphasis added).

Petitioner's failure to obtain and submit a report from Dr. Nelson during the post-conviction proceedings reinforces the inference that Dr. Nelson must have told Petitioner's counsel that he (Dr. Nelson) could not offer any support for an incompetency defense or insanity defense.

Dr. Nelson examined Petitioner within two weeks after the crime, and within a few weeks before the guilty plea.[15]   Therefore, Dr. Nelson clearly was in the best position to offer an apposite opinion about Petitioner's mental health status at the time of his crime, and at the time of his plea.  If Dr. Nelson told Petitioner's counsel that he could offer no support for an incompetency or insanity defense – as the record clearly implies – then it was not unreasonable for Petitioner's counsel to not pursue those defenses.  See Forsyth, 537 F.3d at 892 ("[t]rial counsel is not required by the Sixth Amendment to continue shopping for a psychiatrist until a favorable opinion is obtained"), (citing Marcum v. Luebbers, 509 F.3d 489, 511 (8th Cir.2007)).

Petitioner cites the reports of Drs. Barron, Hackett and Hanson in support of his

---

[15]   According to Petitioner's post-conviction (and current) counsel, Dr. Nelson examined Petitioner in December 2002, in January 2003, and in February 2003. (Affidavit of Kyle White, at p. 1, ¶ 4, included in the present record as an attachment to "Petitioner/Appellant's Brief and Appendix" in the Minnesota Supreme Court, which has been submitted as part of Respondent's Answer, (Docket No. 7).)

ineffective assistance of counsel claims, but the Court has already explained why those reports provide little aid to Petitioner's cause.  First, the timing of those reports greatly reduces their relevance.  (It will be recalled that Dr. Barron examined Petitioner more than a month <u>before</u> the murder, and more than four months before Petitioner's guilty plea; and Drs. Hackett and Hanson examined Petitioner more than a year after the murder and plea.) More importantly, <u>none of the three experts cited by Petitioner actually opined that he was legally insane when he killed his aunt, or that he was incompetent when he pled guilty to the killing</u>.  <u>See</u> <u>Forsyth</u>, 537 F.3d at 893 (noting that "none of the mental health professionals who had interviewed [the habeas petitioner] expressed an opinion that [he] was legally insane at the time of the murders").

Petitioner has also placed considerable reliance on the Supreme Court's decision in <u>Rompilla v. Beard</u>, 545 U.S. 374 (2005).  In that case, the Court concluded that a criminal defendant had received ineffective assistance of counsel at sentencing, because his attorney did not investigate the court records from a prior conviction, which identified certain mitigating evidence that might have allowed the defendant to avoid the death penalty.  The Minnesota Supreme Court considered <u>Rompilla</u>, and found it to be distinguishable and inapplicable, because Petitioner's trial counsel <u>did</u> investigate the defenses at issue, (incompetency and insanity), by requesting an expert opinion. <u>Bruestle</u>, 719 N.W.2d at 706 ("we conclude that <u>Rompilla</u> is not applicable here because Bruestle's trial counsel, unlike Rompilla's counsel, did recognize and pursue the possibility of a Rule 20 defense for Bruestle").

This case also is different from <u>Rompilla</u>, because Petitioner's counsel acted in

24

accordance with the clearly expressed wishes of his client.  Here, Petitioner was "very adamant about taking responsibility for his actions," and rejected his attorney's advice that there was "nothing to lose by going to trial."  (Tr. 20.)  Although the petitioner in Rompilla reportedly was "uninterested in helping" his defense, (545 U.S. at 381), and perhaps even "obstructive," (id.), there is no reason to think that he was "very adamant" about receiving the death penalty, and rejected his attorney's advice to contest it.

Furthermore, this case is different from Rompilla because Petitioner has not shown that he was prejudiced by his attorney's performance.  In Rompilla, the Supreme Court concluded that "[i]t goes without saying" that the "undiscovered mitigating evidence" could have spared the petitioner from the death penalty.  545 U.S. at 393.  Here, however, Petitioner has provided no reason to believe that his case would have ended differently, if his attorney had represented him differently.  Again, Petitioner has presented no evidence which persuasively demonstrates that he actually was insane at the time of his crime, or incompetent at the time of his plea.  Thus, he has not shown that his case would have had a different outcome if his attorney had raised the insanity and incompetency defenses that he is now proposing.

Finally, it should be noted that this Court scheduled a hearing in this matter, to give Petitioner a chance to present any additional evidence, or any additional legal arguments, that might support his ineffective assistance of counsel claims.  (Order dated February 23, 2009; [Docket No. 13].)  The Court took this unusual step to ensure that the record would include all evidence that Petitioner sought to have considered, including any evidence not previously presented to the state courts.  However, Petitioner's counsel subsequently informed the Court that "a prehearing conference and evidentiary hearing would not be

necessary," because "there would be no additional evidence to submit to the court." (Letter dated March 18, 2009; [Docket No. 15].) Thus, the resolution of Petitioner's ineffective assistance of counsel claims must be based solely on the existing state court record.

For the reasons discussed above, the Court concludes that Petitioner's ineffective assistance of counsel claims are not sustainable based on the existing record. The record shows that Petitioner's attorney considered and investigated the defenses at issue in this case – i.e., that Petitioner might have been incompetent to go to trial, or that he might have been not guilty by reason of mental disease or defect. The attorney sought, and apparently obtained, an expert opinion from Dr. Nelson on those possible defenses. The only reasonable inference that can be drawn from the record in this case is that Dr. Nelson was unable to offer any support for either an insanity defense or an incompetency defense. Furthermore, the evidence subsequently obtained by Petitioner's post-conviction counsel, namely the reports of Drs. Barron, Hackett and Hanson, does not demonstrate that either an insanity defense or an incompetency defense would have been sustainable. Petitioner has informed the Court that there is no other evidence to consider. Thus, the Court concludes that Petitioner has failed to substantiate his ineffective assistance of counsel claims.

## IV.  RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1. Petitioner's petition for habeas corpus relief under 28 U.S.C. § 2254, (Docket No. 1), be DENIED; and

2. This action be DISMISSED WITH PREJUDICE.


Dated: April 8, 2009

 s/ Arthur J. Boylan                        
ARTHUR J. BOYLAN
United States Magistrate Judge

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before April 23, 2009.